# JONATHAN CHESTNUTWOOD *et al.*

*v.*

# ALEXANDER HOOD *et al.*

1. MUNICIPAL SUBSCRIPTION—*right to enjoin.* The right of a citizen and tax-payer of a county to maintain a bill in equity to restrain those who represent the corporate authority of the county from issuing its bonds without the sanction of law, can not at this day be seriously questioned.

2. SAME—*statute authorizing, construed in respect to majority in favor of.* A statute authorizing a corporate subscription in aid of a railroad enterprise, provided that no subscription should be made or bonds issued unless a majority of all the legal voters of the county should vote for the same, at an election to be ordered, and declared that a majority of legal voters at any such election should be held as a majority of the legal voters. Under this statute, an election on the question of corporate subscription was ordered at the same time with the regular election of county officers, at which 3210 votes were cast. There were 1278 votes cast in favor of subscription, and 1275 against the same: *Held,* that a majority of those voting upon the question submitted was not sufficient to authorize the subscription, but that a majority of all those voting at the election should vote in favor of the same, was necessary.

3. If a special election had been called upon the question of subscription, then it seems that the returns of the election officers of the votes on that question, under such a law, would govern.

4. CONSTRUCTION OF STATUTES—*when a strict construction prevails.* It is a well settled rule of construction, that statutes extending the powers of corporations, or increasing the burdens of taxation, must be strictly construed.

APPEAL from the Circuit Court of Randolph county ; the Hon. SILAS L. BRYAN, Judge, presiding.

This was a suit in equity, instituted in the circuit court of Randolph county, by Jonathan Chestnutwood, Edmond Menard, and one hundred and ninety others, all citizens and tax payers of that county, to restrain the delivery of certain bonds of the county to the Cairo and St. Louis Railroad Company.

It is, among other things, alleged in the bill, that the Cairo and St. Louis Railroad Company are acting and claim to be

incorporated by virtue of two acts of the General Assembly —one approved February 16, 1865, and the other, an amendatory act thereof, in force in the year 1869—for the purpose of constructing and equipping a railroad from Cairo, through Randolph county, to a point opposite the city of St. Louis ; that the county court of Randolph county was induced, by the fraudulent representations and conduct of that company, to order an election by the legal voters of the county, to be held at the same time that the regular election for county officers was held, in November, 1869, to determine whether said county should subscribe to the capital stock of said railroad company, to aid in the construction of its road—such subscription to be payable in the bonds of said county, issued under the following provisions and restrictions, viz: "*Provided*, that the line of said railroad shall enter the county at or near the town of Red Bud, a depot being established within the corporate limits of said town, then, on a route to be selected by the company building the same, to a point within the corporate limits of the city of Sparta, thence to the county line, on such route as said company may select: *And be it further provided*, that the amount of said bonds or subscription shall not exceed $5000 per mile for each mile of said railroad constructed within the county, and in the aggregate shall not exceed $160,000: *And be it further provided*, that no bonds shall be issued or liabilities of the county in any way incurred, until at least five miles of said railroad within the limits of Randolph county shall be finished and in running order, when it shall be the duty of the county court to issue the bonds of said county, and deliver over the same to the president, directors and company building said railroad, the sum of $25,000 in said bonds, having not less than ten or more than twenty years to run to maturity, and bearing interest at a rate not to exceed eight per cent per annum, payable semi-annually, at the city of Springfield, Illinois, or at such other point as may be designated in such bonds; and in like manner shall bonds be issued and delivered for each

succeeding five miles of said road, when finished and in running order, until the limit of $160,000 has been reached, or until said road shall be finished to the county line ;" that the proposition of aiding in the construction of said road was voted upon by the voters of the different election precincts throughout said county, at the time indicated in said order, to-wit : on the second day of November, A. D. 1869 ; that at said election there were cast in all the precincts of said county the total number of 3210 legal votes, and that there were cast in favor of subscribing stock, as indicated in said order, the number of 1278 votes, and that there were cast against subscribing stock as aforesaid the number of 1275 votes ; that at the time said election was held, there were residing in said county the number of "3800 legal voters who were entitled to vote ;" that the said county court, consisting of Alexander Hood, county judge, and John Wilson and Philip Wehrheim, associate justices, with John R. Shannon, county clerk, was, on the 15th day of August, A. D. 1871, again convened in special session for the adjourned transaction of county business, "when the said Cairo and St. Louis Railroad Company, by its agents and attorneys, appeared before said court and claimed that the proposition voted upon by the voters of said county at said election, authorizing said court to subscribe stock, as indicated in said order of election, had carried ;" that they insisted on the court to subscribe said stock, and that said agents and attorneys, to remove the doubts entertained by the court as to their authority under the law to subscribe said stock upon the vote cast at said election, "represented to said court that it ought, at least, to subscribe said stock, and thereby put it within the power of said company to test the fact whether or not said proposition had been carried ; that the court, in taking this step, would not and could not waive or prejudice any of the legal rights of the county to test the matter in the future, by suits or otherwise ;" that said court, through the fraud and imposition of the agents of said company, made an order, subscribing to

its capital stock $5000 per mile, for each mile of its railroad to be constructed within the county, not exceeding, in the aggregate, $160,000, and, for the purpose of paying the subscription, directing that bonds, in the sum of $1000 each, amounting in the aggregate to the sum of $160,000, be issued and delivered to the said company. upon the conditions upon which it is claimed said bonds were authorized by said election to be issued, payable in twenty years, at eight per cent interest, etc.

And it is also charged in the bill, that said company are pretending to construct their road through said county, etc., and that the county court will issue and deliver said bonds to it as fast as each successive five miles of said road is finished in said county; that if the bonds should be delivered to said company, they would at once be negotiated, making it both difficult and expensive for the county to avoid their payment; that said action of the court would be injurious to the financial interests of the county, depreciate the value of real estate therein, and increase the general burden of taxation.

The prayer of the bill is for an injunction against the delivery of the bonds or any evidences of indebtedness binding or assuming to bind the county, to or on behalf of the said railroad company.

There are also other allegations of errors and irregularities in the mode of submitting the questions voted upon, in the organization of the company, and in the manner of constructing the road, which, in the view of the case taken by the court, are unimportant.

The court below sustained a demurrer to the bill, and dismissed it for the want of equity.

Mr. WILLIAM H. UNDERWOOD, and Mr. WM. HARTZELL, for the appellants.

Messrs. G. & G. A. KŒRNER, and Mr. R. M. DAVIS, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The only question raised by the errors assigned· is, was the demurrer to the bill properly sustained ?

The right of a citizen and tax-payer in a county to maintain a bill in equity to restrain those who represent the corporate authority of the county from issuing its bonds without the sanction of law, can not, at this day, be seriously questioned. It is amply sustained, both by principle and precedent. Dillon on Mun. Corp. 682, secs. 731, 732 and 733 ; High on Injunctions, 462, secs. 783 and 784. This court has repeatedly acted upon and recognized the correctness of the principle. *Prettyman* v. *The Supervisors of Tazewell Co.* 19 Ill. 406 ; *Harding* v. *R., R. I. and St. L. R. R. Co.* 65 Ill. 90 ; *Schall et al.* v. *Bowman et al.* 62 Ill. 321.

It only remains to determine whether the facts alleged in the bill show that the bonds enjoined are not authorized by law.

The first section of the "Act to amend 'an act to incorporate the Cairo and St. Louis Railroad Company,' in force April 15, 1869," after authorizing towns, cities and counties to subscribe for and take stock in that company, or make a donation in aid of the construction of its road, to issue bonds in payment thereof, and to levy a tax for the payment of the bonds or donation, contains these provisos : "*Provided,* that no such subscription or donation shall be made, no such bonds shall be issued, and no such tax shall be levied, unless a majority of the legal voters of said town, city, county or township shall vote for the same, at an election to be held under the order of the corporate authorities in cases of towns and cities, and of the county court in cases of counties, or supervisors of townships, as is now provided for by law or as may be hereinafter provided for : *And provided, further,* that a majority of legal voters at any such election shall be held as a majority of the legal voters of any such township, town, city or county, and that the questions of making a subscription

or donation, of issuing bonds and levying taxes may be submitted as one question or as separate questions at such election, and either or all of said questions may be submitted to an election, at any time, in the discretion of the parties authorized to call such election—thirty days' notice of such election to be given, as in case of county elections." Private Laws of 1869, vol. 3, 256.

It is contended by counsel for appellees, that, by a fair construction of this language, a majority of those voting upon the question submitted, is a majority of legal voters at such election. We are unable to concur in this view.

The manifest purpose of the Legislature in the enactment of these provisos was, to protect tax-payers from the imposition of the proposed burdens, unless a majority of the legal voters of the town, city, county or township whose subscription or donation is desired shall authorize them by an affirmative vote, and to provide a reasonably accurate, and, at the same time, feasible mode, by which to ascertain such majority.

We think the case is sufficiently analogous, in principle, to the case of the *People* v. *Wiant*, 48 Ill. 264, to be governed by the rule there announced. The first proviso is substantially the same as the language of the statute, which followed the language of the constitution, relating to the removal of the county seat of DuPage county; and the second proviso prescribes, practically, the same means to ascertain the majority of the legal voters which was there prescribed, by construction, as being the most reasonable method to attain that result.

In that case it was said by this court: "It is not the vote cast upon that single question that is to govern, where it occurs at any other election held at the same time; but it must appear that a majority of all the votes cast at that election were in favor of removal. Where there is no other election held at that time, the returns of the officers of votes on that question will govern."

In this case the averment in the bill is, that the question was submitted, to be determined by the legal voters of the county, at the regular election for county officers, in November, 1869. This was but one entire election. Although several questions were then voted upon, no voter was entitled to vote more than one time; nor was he allowed to cast more than one ballot. Neither separate ballot boxes nor poll books were kept for the different questions voted upon. Whether the voter at the election was voting on one or all of the questions submitted, could only be determined by reading his ballot; but a person voting a blank ballot, or for or against a part of the questions submitted, would be a voter at such election, and his name would go on the poll books as such, precisely the same as the person who voted upon every question, for it could not be pretended that the right of an individual to vote, or the fact of his having voted at an election, is to be determined by what he shall vote for. Those, therefore, were voters at the election, who gave in their ballots in the usual way, without regard to what or whether any preference was expressed by the ballot on the different questions to be determined by the election. A majority of those voting on a particular question would be determined by the ballots, but a majority of those voting at the election would be determined by the poll books, showing the names and numbers of those voting.

It is argued by counsel, that *Holcomb* v. *Davis*, 56 Ill. 413, is analogous to this case, and sustains the position contended for by appellees. We do not think so.

The question in that case was, whether the stock law had been adopted at an election held for that purpose. It is there shown that the ninth section of that law declares, if a majority of all the votes cast in the county are in favor of adopting the law, then the law shall be and continue in full force; and that the tenth section declares, in case a majority of the votes cast are against the adoption of the law, the county court shall have power, at any subsequent regular term, to submit

the same question to the voters of the county. An affirmative and negative vote are both required. And this court, in order to give effect to both sections, held that the true construction of the sections, when considered together, only requires a majority of the votes cast on the question, to give force to the law.

But in this case no negative vote is required—no further action is to be taken by the county court, in the event that a majority of the legal voters at the election shall not vote for the subscription. An affirmative vote, which shall be a majority of the legal voters at the election, is required to authorize the subscription, and without it, no subscription can be lawfully made. Had the Legislature intended that a majority of those voting upon the question should be sufficient, we are unable to conceive why it was not so said in the act.

It is a well settled rule of construction, that statutes extending the powers of corporations, or increasing the burdens of taxation, must be strictly construed. The wisdom of this rule can not be questioned. Recent experience demonstrated the necessity of even limiting the powers of the Legislature very materially in the enactment of such laws, and it was accordingly done by a provision of the constitution.

This law must be enforced as it is written ; and as it appears by the bill that there were cast, in the different precincts of the county, at the election, 3210 legal votes, and in favor of the subscription only 1278 votes, those representing the authority of the county had no power to make the subscription, and consequently can not issue or deliver the bonds of the county for its payment. The demurrer to the bill should have been overruled, and the defendants allowed, if they thought proper, to answer.

The decree is reversed and the cause remanded.

*Decree reversed.*